UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

JUDGE SULLIVAN

COMPLAINT – ACTION FOR DAMAGED FOR PROPERTY RIGHTS INFRINGEMENT

CIVIL ACTION NO: 15CV-1862 RJS

```
------------------------------------------------------------X
MALIBU MEDIA, LLC,                                          :
                              Plaintiff                     :
                                                            :
Vs.                                                         :
                                                            :
JOHN DOE subscriber assigned IP address: 108.41.235.16      :
                                                            :
                              Defendant                     :
------------------------------------------------------------X
```

RECEIVED
SDNY PRO SE OFFICE
2015 SEP -3  A 9: 23

**DEFENDANT'S MOTIONS TO STRIKE "EVIDENCE" IN EXHIBIT A, AMENDED COMPLAINT, TESTIMONIES OF COLETTE FIELD, PATRICK PAIGE, AND TOBIAS FIESER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____9/3/15

INTRODUCTION TO MOTIONS CONTAINED HEREIN TO STRIKE:                3

MOTION TO STRIKE TESTIMONY OF COLETTE FIELD DOCKET #9:            5

    INTRODUCTION                                               5

    THE DEFENDANT MOVES TO STRIKE                              8

MOTION TO STRIKE TESTIMONY OF PATRICK PAIGE DOCKET #10:          13

MOTION TO STRIKE TESTIMONY OF TOBIAS FIESER DOCKET #11:         14

MOTION TO STRIKE AMENDED COMPLAINT:                             15

    INTRODUCTION                                              15

    THE DEFENDANT MOVES TO STRIKE                             15

MOTION TO STRIKE "EVIDENCE" CONTAINED IN EXHIBIT A:            19

    INTRODUCTION                                              19

    "EVIDENCE" CONTAINED IN EXHIBIT A                         19

        1: Hit Date Proximity                                20

        2: Alleged Infringement Prior to Registration Date   21

        3: Copyright Misuse                                  23

        4: Hashes contained in "Evidence" are not copyrighted  25

    CONCLUSION                                                28

EXHIBIT C - CHART 1 - *Time Distribution of Upload on Publication Date*   29

EXHIBIT C - CHART 2- Distribution of Titles by Uploader         30

EXHIBIT C - TABLE 1- *Titles Uploaded to BitTorrent  Before Publication*   31

**INTRODUCTION TO MOTIONS CONTAINED HEREIN TO STRIKE:**

The Defendant in this matter has already objected to the authentication, and reliability of the underlying evidence contained within this lawsuit in two different motions to quash the subpoena information from the Defendant's ISP. The court, in both circumstances, stated questions raised by the Defendant upon the underlying "evidence" might prove fruitful in later stages of prosecution. The Court, however, deemed the vehicle, a motion to quash, too early in the process to carry those objections. The Defendant objected to that conclusion as well. If the underlying merits of the case are obviously deficient from the onset, the Defendant should not need to be involved in any significant manner. At the time, the Court disagreed, and allowed the Plaintiff to proceed anyway.

The Plaintiff has now laid the foundation for their lawsuit with an amended claim under seal, yet served the Defendant with an **unsealed** copy in a public venue. Further, the process server even read the unsealed complaint. Security camera proof has been supplied (*Exhibit D, Counterclaim*). At any rate, the timing for a motion to strike or amend any known "evidence", claims, or testimony is appropriate. The Defendant moves to strike or amend the following "evidence", claims, and testimony provided by the Plaintiff as outlined in part as an answer to the court's allowance to proceed with the subpoena to the Defendant's ISP along with an extension of time to serve process, and also as an answer to the Plaintiff's decision to proceed with this case, as the Plaintiff says "after careful consideration" even despite being given fair warning of a pending counterclaim for several provisions of the RICO Act on two separate occasions. The counterclaim has also been submitted for the court's consideration.

These motions to strike or amend have been raised with a well researched proper foundation sufficient to carry the weight of a reasonable minds test even giving the advantage of assumption to the Plaintiff. The Defendant does not allow any assumption the "evidence", claims, or testimony as presented by the Plaintiff is valid or admissible upon the Defendant or this case for the purposes of these motions.  The Defendant considers the "evidence" and any conclusions drawn by the Plaintiff at this stage of prosecution at best only proposed.  **These motions shall not be considered a statement of defense, affirmative or otherwise, in any way what-so-ever.**

**MOTION TO STRIKE TESTIMONY OF COLETTE FIELD DOCKET #9:**

**INTRODUCTION**

The Plaintiff essentially asserts the downloading of these films has a non-negligible damaging impact to their business model.  The Defendant asserts the entire company was formed for the purpose of bringing litigation as a business model.  The first suit filed was on 2-8-12, exactly 1 year to the day from when the company was founded and included tracking information less than 8 months after being "in business".  Further, Malibu Media has not provided any proof to the non-negligible impact and further stated in their own agent's company manual that they cannot prove it either, *APCM Manual Page 19*. Noting, APCM, Guardaley, IPP are all the same company (*Malibu Media vs John Doe(s) 1:14-cv-00223*). As such, the Defendant is not entirely sure that Malibu Media has not already consumed their addressable market or even knew what their addressable market was before filing the first lawsuit. Generally, when a company notices a flattening of a growth trend they look at how to offer additional products or services to expand the addressable market size and continue to grow.  In a nearly identical copycat, "*Prenda Law*" business decision, Malibu Media decided to go after alleged copyright infringement instead of expanding their legitimate product portfolio through diversification.

The Plaintiff asserts "they have tens of thousands of subscribers and they are finding it hard to grow and maintain memberships as so many people are finding our films for free." *Declaration of Colette Fields in support of Plaintiff's motion to take leave of Rule 26 conference.  Doc No. 9.*  Why in three years has Malibu Media not made any attempt to further secure new content?  Is Malibu Media's choice to not further secure their new content in three years negligent?  How are issuing all these lawsuits not using the court system as a business model?  Where is the data to prove these lawsuits are not a significant portion of the Malibu Media business revenue?  These are just a few of the basic questions that should be asked by any reasonable minded person.

The Defendant, as a business owner, questions the BitTorrent activity as the driving force to a flattening of growth and memberships of X-Art's legitimate business model.  All successful business ventures see an initial growth phase followed by a plateau or downgrade of revenue.  Without anything new to offer most business just fade into non-existence.  It is at the inflection point of growth to plateau, ideally shortly before, that most businesses diversify their product model into additional markets or new products entirely.  The flattening of Malibu Media's growth curve could just simply be that the market is saturated with premium content, content that is similar or better than X-Art, and the product presented by X-Art is no longer novel.  This point is further leveraged by questioning why Malibu Media feels that by going after these infringers that it will lead to an increase in their membership base.  Even if it was not clear that this venture would work or not at the start, Malibu Media has been at this **racket** for over 4 years.  There should be sufficient data available to prove this has appreciably increased the membership base, that these cases are not a significant revenue stream, and continuing to use taxpayer funded courts is the only or at least the most prudent method of proceeding.

Most businesses have found that these infringers are never going to become paying members and to go after them is just a waste of time and resources.  Instead, businesses typically invest in strengthening up their own internal security to insure any new product does not get released into the wild in the first place.  The investment in Malibu Media's case is minor and very easy to implement.  In a four year history of spot checking the torrent trackers, Malibu Media's time from release of their film on their site to the availability on a torrent is still about 3 hours, almost like clockwork.  Further it appears that Malibu Media is inducing infringement through copyright misuse and "unclean hands" in the first place. I'm sure Malibu Media has and will continue to adamantly deny inducing infringement even though the concept is not new, recall Prenda Law, and both companies used IPP/Guardaley/APCM (same company, different names) as their "evidence" generating engine.  Malibu Media will typically state something like "We're not Prenda" in an effort to distance themselves from that fiasco but the back-end "evidence"

gathering and approach to case litigation is similar enough that no statement from Malibu Media is sufficient to distance themselves.

More to the point of bringing lawsuits as a business model, in a New Yorker Article on May 14 2014, it states that membership has fallen to less than fifty thousand.  Following the math through, 50,000 members x 100 USD membership fee per year = 5,000,000 in revenue.  Setting profit from the legitimate side of the business at 2,000,000 and falling.  There have been at least 4444 suits most of the earlier ones were joiners naming hundreds of Defendants to save on court fees but keeping with the conservative theme, let us set the number of paying Defendants at 4,000.  Most settle instead of being associated with the case for somewhere between 1,000, and 5,000 USD plus lawyer fees. (*Anti-Piracy Copyright Management, aka APCM manual, page 19*) Remaining conservative and in favor of the plaintiff, let us set the average payout to 4000 USD per John Doe which comes to a grand total of 16,000,000 USD, or just over 5,000,000 USD per year.  This is in addition to the 3,050,000 in default judgments in 66 cases.  Less legal expenses of 30%, typical of contingent fee counsel in lawsuits, Malibu Media takes home more than 3,000,000 in revenue each year.  Said, another way, it appears to be an easy case to prove that this is in fact a significant part if not a far more profitable part than the original base business.  Certainly far more profitable than any 8 month old business.

She continues with a statement that despite sending thousands of DMCA takedown notifications each week, the infringement continues. *Declaration of Colette Fields in support of Plaintiff's motion to take leave of Rule 26 conference. Doc No. 9*. Setting the number as low as possible. 2000 DMCA takedown notifications per week, according to her own testimony.  It has been at least three years.  Where are the records of at least 312,000 DMCA takedown notices?  Even in the unlikely event that these notices actually exist in this quantity and Malibu Media freely releases this information to the public, has anybody even spot checked them?

**THE DEFENDANT MOVES TO STRIKE**

#13: "*Internet subscription subscription sales are and have always been by far our primary source for revenue.*"  Pursuit of the "*Copyright Troll*" litigation strategy is clearly the primary source of income for Malibu Media as had been outlined in the conservative business case analysis on page 5 of this document using information available publicly.  To state otherwise, without any proof, does not pass the reasonable minds test.  This entire passage should be stricken.

#15: "*We have tens of thousands of members, but we are finding it hard to grow and maintain memberships as so many people are finding our films for free.*"  **All** successful businesses after an initial growth phase reach a plateau and perhaps slight downgrade of revenue without something new to offer their target customers.  It's called saturation of your addressable target market.  To assume the reason for a flattening trend is the result of piracy and in the same breath not do anything about securing the content in the first place is not the responsibility of the community or the court.  The assumption that piracy is the cause and this is the **only** course of action does not pass the reasonable minds test.  This entire passage should be stricken.

#16: "*Each month approximately 80,000 U.S. Residents use BitTorrent to steal our movies*"  The assumption that each download of a torrent equates to a single unique person which if stopped would result in a paying subscription is far beyond any reasonable minds test.  The Plaintiff is asserting that 2.8M individual residents in the U.S. or approximately 1% of the whole population have stolen their movies.  Further, the U.S. residents are not "*stealing*" anything.  The statement is crafted in a way that injects the image of a mom and pop store and the residents are walking into that very store and stealing candy right off the shelf in broad daylight.  The statement

"*approximately 80,000*" should be stricken. The statement "*steal*" should be replaced with "*allegedly download our movies without a license*".

#18: "*For the first 3 years (when our site was not as popular) we did not have as many issues with piracy. Now, that our films are highly desirable, more people steal our movies than pay for a subscription.*" The films are not any more desirable than any other adult content provided in the same market segment of adult entertainment. The passage "*Now, that our films are highly desirable, more people steal our movies than pay for a subscription.*" should be stricken as baseless conjecture. Malibu Media was only in business for 8 months before the first lawsuit.

#19: "*We are even getting many complaints from our members (asking why should they pay when they are available for free on the torrents.*" As a side note, this would also be a clue to the business owners that, at least, your internal security is poor or, at most, the rate that Malibu Media is willfully distributing their own premium content is so aggressive than even your current customers are questioning your business model. The passage "*many*" should be stricken as baseless conjecture and "*complaints*" should be amended to "*questions*" because a customer would not complain about this topic, if that is even true in the first place.

#20: "*We feel people are unlawfully using valuable bandwidth (therefore money) from all people who use the Internet for lawful purposes, while making it harder for film producers, photographers, musicians, writers, designers (the kind of people our business depends on) to make a living.*" Even if that were true, or even possible to support through proof, the Plaintiff in the same breath has no problem wasting the taxpayer funded court system with thousands of frivolous lawsuits. In any case, this passage should be stricken as baseless conjecture. The Plaintiff is not suing the Defendant for unlawfully using valuable bandwidth and it serves no purpose in this case.

#22: *"Brigham and I have gone over our options many times and we realize that the only way we can protect our business is to and our ability to sell subscriptions is to go after the people who are stealing from us."* What were the options that were considered? The clear path of least resistance to a reasonable mind is to just disable the download of the films from the membership website and allow streaming of the subscription content only. It is how most premium video content providers handle their business. If this option was considered, then why was it not pursued? Without any foundation, this passage should be stricken from this case.

#28: *"Despite sending thousands of DMCA takedown notices per week the infringement continues. And, if one searches for X-Art on a torrent website the site will reveal thousands of unauthorized torrents available for free."* The Plaintiff must make at least 312,000 DMCA takedown notices available for inspection (2000 per week for 3 years), or specify an exact number sent and provide those notices for inspection, or strike this passage as gratuitous inflation.

#29: *"We have <u>never</u> authorized anyone to put our works on a torrent website"* Yet the works appear on torrent websites with military-like precision despite the largest and longest standing anti-infringement litigation effort ever attempted. The Defendant will prove conclusively with direct evidence to the contrary later in this document. This passage should be amended to say *"We have authorized our agents to put our works on many torrent websites for the purpose of copyright misuse through inducing infringement in support of our litigation based business model."* The Defendant doubts the Plaintiff will simply tell the truth, therefore the Defendant recommends this passage be stricken in light of conclusive and direct evidence to the contrary (*Page 23, #3 - Copyright Misuse*).

#30: *"I firmly believe that we must exercise our rights under the Copyright Act to prevent infringement.  Otherwise, we face an immediate and serious risk.  It is simply impossible to compete with free."*  The Plaintiff has made no effort to secure their content through traditional means, and there is already far more free fair-use adult content available than paid content. The Plaintiff knowingly entered into the adult content business knowing full well they were already going to compete with a Herculean amount of free content, to think otherwise is foolish. The passage *"It is simply impossible to compete with free"* should be stricken as simpler and far more effective alternatives have not been considered or if they have been considered they have not been implemented within a reasonable amount of time.

#32: *"We do not seek to use the Court system to profit from the infringement like some have suggested.  As previously stated, revenues from subscriptions to X-Art.com are by far and away the dominate driver of Malibu Media's business.  We want the infringement to stop. Accordingly, the purpose of these lawsuits is to motivate people to pay for subscriptions by deterring infringement and seek some reasonable compensation for the massive amount of infringement if our copyrights."*  Malibu Media uses the Court system precisely to profit from the infringement.  The membership content sells for pennies on the dollar on the open market.  It is by far and away more profitable to sue for infringement than sell a subscription in the adult industry.  A reasonable mind will come to the same conclusion.  If the Plaintiff wanted the infringement to stop they would stop distributing the content to the torrent websites themselves.

The Plaintiff will likely deny that statement but they cannot deny if they moved to a streaming only model, as opposed to download with a streaming model option, access to the files for distribution would become much harder and the strain on the taxpayer funded Court system would be drastically reduced.  The Defendant moves to strike the passage *"As previously stated,*

*revenues from subscriptions to X-Art.com are by far and away the dominate driver of Malibu Media's business."* as clearly not supported and further discussed through the body of this motion.

**Wherefore**, the Defendant respectfully moves to strike and/or amend passages 13, 15, 16, 18,19,20, 22,28,29, 30, and 32 as outlined above.  Multiple references to copyright misuse are justified beginning on page 23 and proof provided in Exhibit C of this document.

**MOTION TO STRIKE TESTIMONY OF PATRICK PAIGE DOCKET #10:**

In accordance with the Memorandum and Order by Magistrate Judge Nathaniel Fox of SDNY in *Malibu Media vs John Doe 1:15-cv-01883 (Docket #16, page 4-5)* on April 10th, 2015 and further cited by Judge Hellerstein in *Malibu Media vs John Doe 1:15-cv-04369 (Docket #10, page 10)* on July 6th, 2015 in his Order and Opinion "... Plaintiffs assertion that there is no alternative means of obtaining the desired information is inadequate. The only support for it comes from the declaration of Patrick Paige who, as Magistrate Judge Fox found in a different case, lacks personal knowledge of the methodology used by ISPs to match the IP address with its registrant. Malibu Media, LLC v. John Doe subscriber assigned IP address 207.38.208.137, *15-cv-1883, ECF Doc. No. 16 (Apr. 10, 2015)*. The Paige declaration that Judge Fox found deficient nearly three months ago is identical to the Paige declaration submitted in support of this motion. It fares no better this time." Except for the cover page, the testimony of Patrick Paige is identical in this case as well. Further, with the exception of the cover page and the items listed in Exhibit A and B, all three cases have an identical underlying complaint.

**Wherefore,** the Defendant accordingly moves to strike the entire testimony of Patrick Paige.

**MOTION TO STRIKE TESTIMONY OF TOBIAS FIESER DOCKET #11:**

Tobias Fieser states in his testimony item #13, IPP does not distribute any of the Plaintiff's copyrighted

works.  Which is in direct conflict of what IPP stated in their response to an order to show cause (Malibu

Media vs John Doe 1:13-cv-23714, page 2 B2) *"IPP's software then scans the index of torrent websites for*

*possible matches using a lexical search.  If IPP's servers find a possible match, __the computer file__*

*__associated with the .torrent file is downloaded__ and the logging process begins." (emphasis added)*  This

would be significant proof of perjury.  It is appropriate to strike known perjurious testimony especially

when it is in reference to an expert witness submitting "evidence".

**Wherefore,** the Defendant moves to strike the entire testimony of Tobias Fieser on the grounds of

perjury.

## MOTION TO STRIKE AMENDED COMPLAINT:

### INTRODUCTION

The Defendant simply seeks to essentially rein in the overreaching claims in part or if necessary in whole and strike any conclusions which are not supported through any of the paper-thin circumstantial "evidence" provided.  The lawsuits provided by the Plaintiff are essentially cut and paste boilerplate to make their "copyright trolling" enterprise as efficient and as profitable as possible.  The problem for the Plaintiff is the Defendant actually read the suit and it is clear that, *inter alia*, not one size shall fit all.

### THE DEFENDANT MOVES TO STRIKE

I: *"Defendant Used the BitTorrent File Distribution Network To Infringe Plaintiff's Copyrights"*  No proof, even circumstantially, has been offered to support this statement.  **Amend:** *"Defendant Allegedly used the BitTorrent File Distribution Network To Possibly Infringe Plaintiff's Copyrights."*

#2: *"Defendant is a persistent online infringer of Plaintiff's copyrights. Indeed, Defendant's IP address as set forth on Exhibit A was used to illegally distribute each of the copyrighted movies set forth on Exhibit B."*  No direct evidence was provided by the Plaintiff in support of any portion of this statement.  **Amended:** to *"Defendant allegedly infringed one or more of the Plaintiff's copyrights. Defendant's IP address for the hit times as set forth on Exhibit A might have been used to illegally distribute one or more bits of each of the copyrighted movies set forth on Exhibit B."*

#15. *"The cryptographic hash value of the bit ("bit hash") acts as that bit's unique digital fingerprint. Every digital file has "**nearly**" one single possible cryptographic hash value correlating to it. The BitTorrent protocol utilizes cryptographic hash values to ensure each bit is properly routed amongst BitTorrent users as they engage in file sharing."*  SHA-1 series hashes

are not unique enough to guarantee single occurrence.  Collisions can and have occurred.
SHA-512 are the only ones which can essentially guarantee unique correlation.  **Amended:** to
add the word "nearly" as outlined.  Move to strike "cryptographic", as the hash is not
cryptographic.

#18. *"IPP International UG downloaded from Defendant one or more bits of each of the digital files identified by the file hashes on Exhibit A."*  No proof has been provided that the Defendant is the same person who uploaded the one or more bits to IPP, if that even occurred, or that the Defendant was even in control of the IP address specified at the time of the alleged infringement.  **Amended:** *"IPP International UG allegedly downloaded from the IP address listed in Exhibit A one or more bits of each of the files identified by the file hashes on Exhibit A."*

#19. *"Defendant downloaded, copied, and distributed a complete copy of Plaintiff's movies without authorization as enumerated on Exhibit A."*  No proof, even circumstantially, was provided or even proposed.  **Strike:** #19 in its entirety.

#20. *"Each of the cryptographic file hashes as set forth on Exhibit A correlates to a copyrighted movie owned by Plaintiff as identified on Exhibit B."*  It does not correlate, nor is it cryptographic.
It correlates to the .torrent, not the copyrighted movie.  The torrent is not copyrightable, or even owned by the Plaintiff and does not prove, even circumstantially, the IP address specified in Exhibit A actually downloaded or uploaded one or more bits of the movies identified in Exhibit B.  **Amend:** *"Each of the file hashes as set forth on Exhibit A correlates solely to the metadata of file called a .torrent.  This file is currently not and further cannot be copyrighted or owned by the Plaintiff."*

#21. *"IPP International UG downloaded from Defendant one or more bits of each file hash listed on Exhibit A. IPP International UG further downloaded a full copy of each file hash from the*

*BitTorrent file distribution network and confirmed through independent calculation that the file hash matched what is listed on Exhibit A. IPP International UG then verified that the digital media file correlating to each file hash listed on Exhibit A contained a copy of a movie which is identical (or alternatively, strikingly similar or substantially similar) to the movie associated with that file hash on Exhibit A. At no time did IPP International UG upload Plaintiff's copyrighted content to any other BitTorrent user."*  No correlation can be made with the "evidence" provided that the Defendant was at all involved.  Even if s/he was involved why would sharing "one or more bits" of a not-copyrighted file, which is clearly situated well within a fair use classification, and further not even owned by the Plaintiff consist of copyright infringement upon the Plaintiff. **Strike:** *"IPP International UG then verified that the digital media file correlating to each file hash listed on Exhibit A contained a copy of a movie which is identical (or alternatively, strikingly similar or substantially similar) to the movie associated with that file hash on Exhibit A."* in its entirety as unsupported, and ultimately meaningless in consideration of the "evidence" provided.

#22. *"IPP International UG connected, over a course of time, with Defendant's IP address for each hash value as listed on Exhibit A. The most recent TCP/IP connection between IPP and the Defendant's IP address for each file hash value listed on Exhibit A is included within the column labeled Hit Date UTC. UTC refers to Universal Time which is utilized for air traffic control as well as for computer forensic purposes."*  In comparison to other similar cases, the Plaintiff has historically stated that if there was more than one instance of infringement of the same title over a period of time the details were stated in the exhibit.  No such "evidence" has been provided in this case.  **Amended:** *"IPP International UG connected, with the IP address specified for each hash value as listed on Exhibit A. The only TCP/IP connection that ever allegedly occurred between IPP and the IP address specified for each file hash value is listed on Exhibit A*

*and included within the column labeled Hit Date UTC. UTC refers to Universal Time which is utilized for air traffic control as well as for computer forensic purposes."*

#24. *"Plaintiff's evidence establishes that Defendant is a habitual and persistent BitTorrent user and copyright infringer."*  It does no such thing, even circumstantially.  **Strike:** Passage in its entirety.

#29. *"By using BitTorrent, Defendant copied and distributed the constituent elements of each of the original works covered by the Copyrights-in-Suit."*  No proof has been provided, even circumstantially, to support this claim.  The Plaintiff has only specified that "one or more bits" of the metadata of a not copyrighted .torrent file that is not owned by the Plaintiff may have been uploaded to IPP from the IP address specified.  **Strike:** Passage in its entirety.

#31. *"As a result of the foregoing, Defendant violated Plaintiff's exclusive right to:"* No proof, even circumstantially, has been provided to link the Defendant with the IP address specified for the matter contained within this suit.  **Amended:** *"As a result of the foregoing, the IP address allegedly violated Plaintiff's exclusive right to:"*  Further, even if the Defendant violated the Plaintiff's exclusive right, as alleged, given the scope of the suit, and what little "evidence" was supplied it is impossible for the Defendant to have violated the Plaintiff's exclusive right in (C) and (D).  **Strike:** (C) and (D) as unsupported.

#32. *"Defendant's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2)."*  No proof has been provided, even circumstantially, to support this claim.  **Strike:** Passage in its entirety.

(A) *"Permanently enjoin Defendant and all other persons who are in active concert or participation with Defendant from continuing to infringe Plaintiff's copyrighted works;"*  No "evidence" has been provided that there are any other Defendants. No "evidence" has been

provided that anything is "continuing" or has continued up to this point.  If there was the

Plaintiff has a history of stating that in the initial claims or "evidence."  **Strike:** (A) in its entirety.


## MOTION TO STRIKE "EVIDENCE" CONTAINED IN EXHIBIT A:

### INTRODUCTION

From the beginning, the approach and "evidence" provided by the Plaintiff against the Defendant just

did not smell right.  In reality, it was only a matter of time until the Plaintiff decided to sue an individual

who happens to be innocent, had sufficient knowledge to understand the underlying merits of the case,

and had enough to lose to justify a fight in the first place.  The problem for the Defendant, not having a

solid legal background,  was how to adequately articulate the obvious severe deficiency of the

underlying merits to the court without spending a fortune in legal costs.

Through several motions focusing on "unclean hands", most of which denied, the Defendant found relief

in a granted motion to proceed anonymously.  With the experience gained in these motions along with

quite a bit of research, the Defendant now has a solid enough footing to proceed with a motion to strike

the "evidence" contained in Exhibit A without even requiring additional discovery of the Plaintiff at this

time.  All the information provided in this motion is publically available, and the Defendant will make

every attempt to explain the technical nature of that proof along with the collection method as clearly

as possible.

### "EVIDENCE" CONTAINED IN EXHIBIT A

The Plaintiff through the testimony of Tobias Feiser *(Docket #11, numbered 9-14 page 2-3)* states the

software used, the hashes in Exhibit A *(Docket #1, page 8-10)*, what the hashes represent as well as

echoing those sentiments in the overall complaint *(Docket #1, page 3, item 14-17)*, the IP address, and

hit dates among other items.  The Plaintiff clearly understands what file hashes mean, the different

types of hashes, what they are collecting, what it means, and how they apply to all aspects of the

BitTorrent technology.  There can be no misunderstanding on behalf of the Plaintiff.  The Defendant, also understanding the underlying technology, more so after researching this case,  found this "evidence" to be severely deficient to even issue a lawsuit in the first place let alone request the power of a court ordered discovery subpoena.  Many other courts have come to the same conclusion including multiple cases in SDNY.  The court in their order and opinion stated that while attacks on the underlying merits of this lawsuit might prove fruitful further along in the stages of prosecution the Defendant must adequately articulate the basis for why there is a fundamental problem with the "evidence" or the method of "evidence" generation.  The Defendant is now in a position to adequately detail that articulation.  The Defendant applies the "reasonable minds test" and understands the advantage the Plaintiff automatically gains in a motion to strike "evidence".

### 1: Hit Date Proximity

The Defendant first noticed there were two items in Exhibit A which supposedly had hit dates and times within 1 second of each other (*Docket #1, page 10, line items 2-3*).  Upon a closer examination there were 4 other hit times which were less than 18 seconds apart *(Docket #1: page 8; items 6,7,21,22, page 9; items 6,7, and page 10; items 6,7)* and several more under 1 minute.  From a technical point of view, this just seemed suspicious.  As it turns out, it is not only suspicious but it is actually impossible according to IPP's own testimony.  IPP states, "*The specific length of time IPP's system is setup to maintain a connection during each transaction with an alleged infringer is two seconds before and two seconds after data is transferred*" *(Malibu Media vs John Doe 1:13-cv-23714, page 3, paragraph 1)*.  The Defendant adds that the length of time the data takes to transfer from the USA to Germany (or UK) is probably somewhat variable but given the file size less than 1 minute is a more than a reasonable assumption and very much in favor for the Plaintiff.

Armed with proof that there are several impossible occurrences in Exhibit A, which is supported by IPP in testimony, the Defendant then started downloading the Exhibits from other Malibu Media cases filed at a similar time to see if there were any more which included time stamps that were within a similar short period of time to insure the Plaintiff could not just argue it was nothing more than a typo.  It did not take long to find another 3 cases *(1:15-cv-01848, 1:15-cv-01894, 1:15-cv-01867)* 3 seconds, 7 seconds, and 2 seconds respectively.  Given how quickly this information was obtained against the vast amount of cases submitted by the Plaintiff; the Defendant is confident more examples can be found.  This clearly proves the "evidence" displayed in exhibit A is falsely fabricated beyond just a typo.

**2: Alleged Infringement Prior to Registration Date**

The second item the Defendant noticed in the "evidence" is the "The Most Recent Hit Date UTC", which is referred to in this context as the time the alleged copyright infringement **most recently** occurred.  For 29 out of the 58 works listed, or just over 50%, "The Most Recent Hit Date UTC" occurred and ended before the "Registration Date" *(Docket #1, page 8-13 Exhibit A cross-referenced with exhibit B)*.

While copyright law is in effect from the moment of publication, the owner cannot sue for copyright infringement of that work until that work has been registered.  The Plaintiff will most likely reference the window for registration dates which occurs within 3 months of the publication date.  Litigation history, however, goes on to describe an ongoing alleged infringement that occurs before the registration date, continues after registration, and how the alleged infringer must also be made aware by the copyright owner that a registration of the work has occurred and the alleged infringement continues anyway.  In that case, the Plaintiff to shall not be entitled to statutory damages and legal fees *Derek Andrew v. Poof Apparel*, 528 F.3d

696 (9th Cir. 2008). Simply stating, the copyright holder should not allow anyone access to the work until it has been registered.

The act and litigation history does not specifically outline the case of where an alleged infringement commenced and also ended before the registration date and there was no notification provided by the copyright owner to the alleged infringer that they planned to file a registration or that even if a registration was pending. A reasonable mind, given the limitations outlined above, would come to the conclusion that either the alleged copyright infringement did not occur in the first place, or the copyright owner cannot sue for the alleged infringement, or that the copyright owner is not eligible for statutory damages.

In any case, it did not make sense to the Defendant why the Plaintiff would overlook an error of that magnitude in their own "evidence" unless it was done willfully. For example, making the case seem larger, for a bigger settlement. Giving the Plaintiff the benefit of the doubt in yet a second possible typo style argument, the Defendant already had downloaded a few other cases for the purposes of proving fabrication in the preceding section "Hit Date Proximity". The results were an astounding 633 instances out of 1027 records allegedly occurred and ended before the work was registered, or 61.5%, spread across less than 40 randomly selected cases out of at least 4444. It is practically impossible to argue the justification of a 61.5% error rate in "evidence". This not only supports fabrication in "Hit Date Proximity", but realistically, given the scope, it should be classified as **<u>willful fraud</u>** brought upon the court. Perhaps even the basis for a nationwide class action suit against the Plaintiff for the Defendants who have already settled based upon the full weight of similar exhibits.

**3: Copyright Misuse**

It has long since been rumored Malibu Media, IPP, or one of their agents is responsible for uploading the video files to BitTorrent in the first place.  As recently as July 28, 2015 Judge Liam Grady denied Malibu Media's motion to strike the "unclean hands" defense in his Order and Opinion where the Defendant alleged *inter alia* copyright misuse *1:14-cv-1544 Docket #26 pg 5*. The Defendant, essentially alleges the same copyright misuse here.  The exceedingly short and consistent time (*6:00 AM - 7:00 AM UTC Exhibit C Chart 1, Page 29*) from publication to torrent availability (in comparison with other torrents), followed by the supposed ability to then immediately capture an IP address involved in alleged infringement even before copyright registration, followed by the Plaintiff's flat-out inability to determine the source of the original infringement are alarmingly consistent, alarmingly fast and alarmingly negligent, respectively.

It's not a new concept as Prenda Law was doing precisely the same thing using the same BitTorrent monitoring companies.  Malibu Media has stated in their reply to one of the Defendant's motions "We're not Prenda".  While that is technically correct, the framework is nearly identical.  Given the well documented copycat scenario, the Defendant only needs to prove Malibu Media is in fact involved in the same copyright misuse scheme.

Researching Delvan Neville's well-articulated testimony where he outlines the exact methodology of how he went about proving Prenda Law was "seeding" their own content (*6:12-cv-01493, Exhibit K*), the Defendant employed a similar approach.  The Defendant has already proven that IPP was "seeding" the Malibu Media content in testimony from IPP in the preceding motion to strike Testimony of Tobias Fieser.  The Court did not discount that fact at the time, they simply said it was not enough to prove "unclean hands".  The Defendant, upon further research agrees, that was not enough.   While it clearly shows that Malibu Media is

actively trying to keep the infringing torrents alive to keep fueling their litigation engine, it does not, for example, address how the content was uploaded to BitTorrent in the first place.

Most of Malibu Media's works, 84% (*Page 30, Chart 2*), are initially uploaded to BitTorrent by users "chkm8te" and "drarbg" with military-like precision (as though it was their job) between 6:00 AM and 7:00 AM UTC on the day of publication (*Page 29, Chart 1*) over the course of 4 years. That is an impressively narrow band given the number of years of involvement. Giving the Plaintiff every possible option for reasonable doubt in a motion to strike evidence, the Court must assume "chkm8te" and "drarbg" were just paying subscription members to X-Art who were sharing the content they had downloaded with the torrent community and these users are also impossible for Malibu Media to find within their membership database even given the shocking regularity of the uploads.

There were 6 exceptions in the "evidence" provided in this case. The films "Feeling Frisky", "Go Fish", "Not Alone", "Playing Dress Up", "Rendezvous", and "The Secretary" were uploaded at least a full day before publication (*Table 1 page 31-34*). Insuring this was not a typo, the publication dates matched the dates reported on the X-Art website as well as the dates stated on the copyright registration. The upload dates and users were verified against two independent BitTorrent websites. The study was continued using the body of exhibited data collected for "Hit Date Proximity", and "Alleged Infringement Before Registration Date" and of the 309 titles surveyed 28 titles, 10%, were uploaded to BitTorrent before publication. Of the early uploaded titles 53% were initially uploaded by either "chkm8te" or "drarbg". This proves conclusively that the two largest Malibu Media torrent "seeders" by username had insider access the films and initially uploaded many of them to BitTorrent well before publication to the general membership subscriber area of the X-Art website.

Further, the initial principle uploaders seem to be working in concert with each other. Meaning, that if "chkm8te" was the original source of the torrent he continued the effort to several other sites and "drarbg" did not duplicate the effort of "chkm8te". **This proves conclusively and directly given the undeniable insider access that at least "chkm8te" and "drarbg" are agents of Malibu Media**, there is strong circumstantial evidence, given the number of years this has continued, to support they were further authorized by Malibu Media to upload the content to the torrent website in the first place. Further, there is reasonable circumstantial evidence to support they either knew each other or are simply the same person. Conclusively proving, through confirmed direct evidence, copyright misuse on behalf of Malibu Media. There is no other possible explanation and a reasonable mind would come to the same conclusion.

### 4: Hashes contained in "Evidence" are not copyrighted

The Plaintiff goes on at length in both the complaint and in supporting testimony of the SHA1 hash and how that is a unique digital fingerprint of the files listed in exhibit A. The theme of this position by the Plaintiff is echoed nearly in verbatim in most, if not all, of the other cases historically. The Plaintiff specifically states, "*IPP International UG downloaded from Defendant one or more bits of each file hash listed on Exhibit A. IPP International UG further downloaded a full copy of each file hash from the BitTorrent file distribution network and confirmed through independent calculation that the file hash matched what is listed on Exhibit A.*" There is no possible explanation of why the Plaintiff did not fully understand the file hashes in Exhibit A based upon the vast cast history and vast amount of testimony all of which are reasonably consistent.

Based upon the allegedly digital fingerprint like uniqueness, as reported by the Plaintiff and by IPP. The Defendant purchased a yearly subscription to X-Art and downloaded all formulations of

"Fucking Ballerinas" the most recent item in Exhibit A  in all resolutions ranging from 640x360 to 1920x1080 directly from the membership area of Plaintiff's website in strict accordance with the license agreement provided to members of X-Art.  There was not a single file supplied by X-Art under the title "Fucking Ballerinas" which was excluded from this study.  The Defendant then ran the standardized SHA1 algorithm to see if there was a SHA1 Hash match between any of the actual copyrighted digital files supplied by the Plaintiff and the item hash listed in Exhibit A.  Not one of the SHA1 Hashes of the formulations of "Fucking Ballerinas" matched the item listed in Exhibit A.  Said another way the reportedly "unimpeachable" nature of IPP and the software they wrote and the vast amount of cases filed by the Plaintiff, **the digital fingerprints simply did not match**.

Admittedly confused, the Defendant considered that maybe the Hash listed was of a specific piece of the digital file after it was broken up by the .torrent but before it was reassembled.  The Plaintiff discussed a strong understanding of this in their complaint #15.  The individual file hash tables of the copyrighted file are publically available in the .torrent file itself to aid in verification and reassembly of thousands of small files should the download even be completed.  The Defendant then proceeded in viewing the technical contents online of all of the .torrent files found loosely referencing the title "X-Art" and "Fucking Ballerinas".  This step can, and was, done without downloading or uploading anything.  Quite a few .torrent files were available.  Again, for all the .torrents found **there were no hash matches**.

Quite puzzled at this point, the Defendant was about to give up assuming some sort of error was made in the study or the torrent simply could not be found.  It was then that the Defendant noticed that there was one separate file hash reference not in the .torrent file, but on the

torrent website which represents only the metadata of the .torrent file but not any portion of the copyrighted digital media file.  This is called the "infohash" of the .torrent file.

At this point, the court needs to briefly understand that the BitTorrent system works quite simply in its underlying technology.  The Defendant explains, a digital file is broken up into thousands of exceedingly tiny pieces each piece receiving their own unique SHA1 hash.  It is these exceedly tiny pieces that are constantly called into question by Defendants as to whether or not they actually represent enough of the digital file to be considered copyright infringement. In any case, a record of all of these hashes, called a "hash table", is then stored inside a completely separate file called a .torrent which is similar to a library card in a traditional card catalog.  The .torrent file is commonly downloaded first and independently of any of the pieces referenced within because just like in a library you cannot find the book, or in this case, words on the pages of the book, without the reference from a library card.  The .torrent file is quite small, encrypted, and nothing contained within the .torrent is copyrightable as it is just a collection of hashes, a few hyperlinks, and maybe a short description of the referenced file.

As it turns out, there is a match between the hash referenced in Exhibit A under the title "Fucking Ballerinas" except the hash is not of the allegedly copyrighted file, it is the hash that represents only the metadata of one of the .torrents with a completely different title.  The Plaintiff must have assumed that nobody was actually going to check if the SHA1 Hash listed in Exhibit A actually matched the SHA1 Hash of the copyrighted file hosted on the Plaintiff's website or one that was substantially similar visually.

Armed with a method, the Defendant then went looking and found a match for nearly every single hash listed in Exhibit A.  They all represented the .torrent and not the actual copyrighted digital file in part or in whole.  Again, giving the Plaintiff the full weight of the benefit of the

doubt in a possible typo, the body of data collected for "Hit Date Proximity", "Alleged Infringement Before Registration", and "Copyright Misuse" was checked.  **Not a single hash listed was for a single piece of the referenced copyrighted work in whole or in part**.

In effect, the items listed are just .torrents, are not copyrightable, and further not owned by the Plaintiff.  If the 100% match rate holds, the Plaintiff has brought to the court at least 4444 copyright infringement cases without referencing a single copyrightable item in "evidence". Willful fraud and abuse at this scale, should not be overlooked.  If the counter-evidence supplied in "Hit Date Proximity", "Alleged Infringement Before Registration", and "Copyright Misuse" were not sufficient for sanctions, this certainly should be enough.  At the very least, "Hit Date Proximity", "Alleged Infringement Before Registration", "Copyright Misuse", and "Hashes Contained in "Evidence" are not Copyrighted" should be enough to strike the "evidence" in Exhibit A in its entirety from this case.

## CONCLUSION

For all of the foregoing reasons, this court should, at a minimum, strike the testimony of Colette Field as outlined, Patrick Paige in its entirety, Tobias Fieser in its entirety, the complaint as outlined, and the "evidence" contained within Exhibit A in its entirety on the grounds that a reasonable mind would come to the same conclusion.

Respectfully,

John Doe 108.41.235.16 pro se litigant

**EXHIBIT C - CHART 1**



Chart 1: *306 titles were surveyed, 231 of those titles were uploaded to BitTorrent on the same day as publication.  158 of those films were uploaded between 6:00AM and 7:00AM UTC.  The distribution of same publication day upload times by hour are shown.*

**EXHIBIT C - CHART 2**



Chart 2: *306 titles were surveyed, 231 of those titles were uploaded to BitTorrent on the same day as publication. The concentrated distribution of uploads by username is shown.*

# EXHIBIT C - TABLE 1 (PAGE 1 OF 4) - *Uploads to BitTorrent Before Publication*



| | X-Art Publication Date: | BitTorrent Upload Date: | Case Number(s): |
|---|---|---|---|
| **A Little Rain Must Fall**<br>InfoHash: F1BF1A29854A59DF8ABEE23B1082D3F9F3F864A4 | 01-23-13 | 01-21-13   7:52:47 AM | 1:15-cv-01855 |
| **A Perfect Match**<br>InfoHash: E6C799E4EE2BE3F8428638837C058703894FD3FE | 09-11-13 | 09-10-13   6:51:51 PM | 1:15-cv-00558  3:15-cv-01822<br>3:15-cv-01814 |
| **Anneli Leila Menage A Trois**<br>InfoHash: 05AA1FF8AF54D5986DD29082ACAAC15961D0AE2B | 01-13-12 | 01-12-12   8:41:30 PM | 1:15-cv-01834 |
| **Barely Fits**<br>InfoHash: DC68B75F6D146B1139EC9559C4AE1CEA5BF8CD7D | 01-03-15 | 01-02-15 | 1:15-cv-01848  3:15-cv-01817<br>1:15-cv-01864  3:15-cv-01799 |
| **Best Friends With Benefits**<br>InfoHash: F53A589E3518D865F254E342E974D2636B12D27E | 03-07-15 | 03-06-15   6:44:47 AM | 2:15-cv-03495 |
| **Bring Me To My Knees**<br>InfoHash: C3F656CDA6134E356980476DAB07D8913E01DF6E | 02-15-15 | 02-15-15   5:02:07 AM | 1:15-cv-04369  2:15-cv-04304<br>2:15-cv-04310 |
| **Capture Me**<br>InfoHash: 865EEF0EC63BC17A2A4B4CF13E1E02782C1D4A10 | 05-16-15 | 05-15-15   5:18:30 AM | 2:15-cv-04307 |

## EXHIBIT C - TABLE 1 (PAGE 2 OF 4)

| Caribbean Christmas | X-Art Publication Date: | 12-24-14 | |
| | BitTorrent Upload Date: | 01-03-11 | 10:09:41 PM |
| | Case Number(s): | 1:15-cv-01861 | 3:15-cv-01805 |
| InfoHash: 150D770F97246C88243F82EFAA7A0BC859B01DF6 | | 3:15-cv-01818 | |

| Catching Up | X-Art Publication Date: | 04-13-14 | |
| | BitTorrent Upload Date: | 04-12-14 | 6:43:24 PM |
| | Case Number(s): | 1:15-cv-00571 | 3:15-cv-01808 |
| InfoHash: 0AE98756E2C8322083CED526F30CDD52894FA89C | | 1:15-cv-00575 | 1:15-cv-01867 |

| Come Together Part #2 | X-Art Publication Date: | 05-07-15 | |
| | BitTorrent Upload Date: | 05-05-15 | |
| | Case Number(s): | 2:15-cv-04304 | |
| InfoHash: 1DA2098EFDC904E2C0E9AA628D11D5688EAA58C0 | | | |

| Cum Worthy | X-Art Publication Date: | 03-13-15 | |
| | BitTorrent Upload Date: | 03-12-15 | 6:08:59 AM |
| | Case Number(s): | 2:15-cv-03495 | |
| InfoHash: 81EC95CD5299389B06D269AF7B6AC03FCC2C6536 | | 2:15-cv-04310 | |

| Go Fish | X-Art Publication Date: | 02-13-14 | |
| | BitTorrent Upload Date: | 02-12-14 | |
| | Case Number(s): | 1:15-cv-01862 | 1:15-cv-01891 |
| InfoHash: 5DA7CA3D12DB4D72842718BC3EE6CA09197583AE | | 3:15-cv-01818 | |

| Grow Up With Me | X-Art Publication Date: | 10-17-13 | |
| | BitTorrent Upload Date: | 10-16-13 | |
| | Case Number(s): | 1:15-cv-01843 | 1:15-cv-01855 |
| InfoHash: 2921D063D086ADF1454AD6C838189978EEDF4E1B | | 1:15-cv-01867 | |

| Keep On Cumming | X-Art Publication Date: | 04-30-15 | |
| | BitTorrent Upload Date: | 04-29-15 | 10:48:58 AM |
| | Case Number(s): | 2:15-cv-03478 | 2:15-cv-04307 |
| InfoHash: 7D6D10E3864F0CAA8E1AB9604D5ECD6865B6FDE2 | | 2:15-cv-04304 | 2:15-cv-04310 |

| Late for Work | X-Art Publication Date: | 03-15-13 | |
| | BitTorrent Upload Date: | 03-14-13 | 5:45:24 AM |
| | Case Number(s): | 1:15-cv-01848 | 2:15-cv-04307 |
| InfoHash: 65FE8BDB2A66827CB26D689DE18486DEC3B8AEC7 | | | |

| Let Me Join You | X-Art Publication Date: | 03-15-15 | |
| | BitTorrent Upload Date: | 03-14-15 | 5:35:43 AM |
| | Case Number(s): | 2:15-cv-04310 | |
| InfoHash: 33E0ABD791B502221992558A15177D245EC5FFF0 | | | |

| Not Alone | X-Art Publication Date: | 04-09-14 | |
| | BitTorrent Upload Date: | 04-08-14 | |
| | Case Number(s): | 1:15-cv-00573 | 1:15-cv-00575 |
| InfoHash: E1C4CD147A01FF0CAB03187D8D90B4430F7A1CC5 | | 1:15-cv-01849 | 1:15-cv-01862 |

## EXHIBIT C - TABLE 1 (PAGE 3 OF 4)

| Photo Fantasy | | |
|---|---|---|
| **X-Art Publication Date:** | 09-28-12 | |
| **BitTorrent Upload Date:** | 09-27-12 | 3:25:00 PM |
| **Case Number(s):** | 1:15-cv-01841 | |
| **InfoHash:** A5DF840D07A33B3718D33B01CC0FC45815A134F0 | | |

| Raw Passion | | |
|---|---|---|
| **X-Art Publication Date:** | 08-18-13 | |
| **BitTorrent Upload Date:** | 08-17-13 | 7:51:24 AM |
| **Case Number(s):** | 1:15-cv-00575 | 1:15-cv-01891 |
| **InfoHash:** E23615F28D88187A3A7715526B5AFEF5550194C4 | | |

| Rendezvous | | |
|---|---|---|
| **X-Art Publication Date:** | 04-12-14 | |
| **BitTorrent Upload Date:** | 04-11-14 | 6:13:21 AM |
| **Case Number(s):** | 1:15-cv-01855 | 1:15-cv-01862 |
| **InfoHash:** 1F3E41E60D2617B25A613E12D173AB60F98B68AA | | |

| Spilled Milk | | |
|---|---|---|
| **X-Art Publication Date:** | 03-08-13 | |
| **BitTorrent Upload Date:** | 03-07-13 | 7:10:33 AM |
| **Case Number(s):** | 1:15-cv-01855 | |
| **InfoHash:** 9ED24C0BD89D55DD7265A2AFD874420A1516FA75 | | |

| Starting Over | | |
|---|---|---|
| **X-Art Publication Date:** | 08-27-12 | |
| **BitTorrent Upload Date:** | 08-26-12 | 10:33:49 AM |
| **Case Number(s):** | 1:15-cv-01848 | 1:15-cv-01891 |
| **InfoHash:** DA7A9BC34BC45275A7A7BC29BD40D918D0BA455F | | |

| Stay for a While | | |
|---|---|---|
| **X-Art Publication Date:** | 07-05-13 | |
| **BitTorrent Upload Date:** | 07-04-13 | 9:58:49 PM |
| **Case Number(s):** | 1:15-cv-01843 | |
| **InfoHash:** C0EAD687A69258C3B4A996FEC98C63C35F67FF1A | | |

| The Journey | | |
|---|---|---|
| **X-Art Publication Date:** | 10-07-13 | |
| **BitTorrent Upload Date:** | 10-06-13 | 8:36:52 PM |
| **Case Number(s):** | 3:15-cv-01818 | |
| **InfoHash:** 6680F258C406B454766912EC8DCDA9739BC367B9 | | |

| The Secretary | | |
|---|---|---|
| **X-Art Publication Date:** | 01-09-15 | |
| **BitTorrent Upload Date:** | 01-08-15 | |
| **Case Number(s):** | 1:15-cv-01830 | 2:15-cv-04310 |
| | 1:15-cv-01841 | 3:15-cv-01799 |
| **InfoHash:** EB47647F0B410EA2A94999F1189185B3BF4684CC | | |

| Two Boys and a Girl | | |
|---|---|---|
| **X-Art Publication Date:** | 03-05-13 | |
| **BitTorrent Upload Date:** | 03-04-13 | 8:39:22 AM |
| **Case Number(s):** | 1:15-cv-01891 | |
| **InfoHash:** D847B503DC06820BFE08A4DF28D9CBAF7C5D1C31 | | |

| Warm Inside | | |
|---|---|---|
| **X-Art Publication Date:** | 01-11-13 | |
| **BitTorrent Upload Date:** | 01-10-13 | 10:33:12 PM |
| **Case Number(s):** | 1:15-cv-00573 | |
| **InfoHash:** A3D2E44E922CAF5F39268A88B58B47905B81AD19 | | |

**EXHIBIT C - TABLE 1 (PAGE 4 OF 4)**

| | Why I Love Czech Girls | X-Art Publication Date: | 11-07-14 | |
|---|---|---|---|---|
| | | BitTorrent Upload Date: | 11-02-14 | 5:13:33 AM |
| | | Case Number(s): | 1:15-cv-01841 | 2:15-cv-03495 |
| InfoHash: | 6A38CAF27EB618E2273BD79F8ECC706082A072B7 | | 1:15-cv-01862 | 2:15-cv-04310 |